AZ 5/7/2024    Case 1:23-cr-00056-JKB   Document 93   Filed 05/14/24   Page 1 of 15

___ FILED   ___ ENTERED
___ LOGGED  ___ RECEIVED

12:42 pm, May 14 2024
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

Kathleen O. Gavin
Assistant United States Attorney
Chief, National Security and Cybercrime
Kathleen.Gavin@usdoj.gov

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4887
MAIN: 410-209-4800
FAX: 410-962-3091

May 7, 2024

<u>VIA EMAIL</u>

Sedira Banan, Esquire
Assistant Federal Public Defender
Office of the Federal Public Defender
District of Maryland
Tower II, 9th Floor
100 South Charles Street
Baltimore, Maryland 21201

      Re: <u>*United States v. Sarah Beth Clendaniel*</u>
          <u>Criminal No. JKB-23-0056</u>

Dear Ms. Banan:

      This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Sarah Beth Clendaniel (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by May 10, 2024, it will be deemed withdrawn. The terms of the Agreement are as follows:

<u>Offenses of Conviction</u>

      1.    The Defendant agrees to waive indictment and plead guilty to a two count Superseding Information that charges her with conspiracy to damage energy facilities in violation of 18 U.S.C. § 1366(a) and with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The Defendant admits that the Defendant is, in fact, guilty of those offenses and will so advise the Court.

### Elements of the Offenses

2. The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

#### Conspiracy to Damage Energy Facilities

That in or about the time period alleged in the Indictment, in the District of Maryland and elsewhere,

a. Two or more persons reached an agreement or understanding to knowingly and willfully damage the property of an energy facility;

b. The Defendant knowingly and intentionally joined the agreement;

c. The amount of damage to the energy facility, if the objective of the conspiracy had been achieved, would have exceeded $100,000, or the Defendant conspired to damage an energy facility in any amount and to cause a significant interruption or impairment of a function of the facility.

#### Felon in Possession of a Firearm

That on or about the date alleged in the Information, in the District of Maryland and elsewhere,

a. The Defendant knew that she was convicted in any court of a crime punishable by imprisonment for a term exceeding one year;

b. The Defendant knowingly possessed the firearm as charged; and

c. The possession charged was in or affecting interstate commerce.

### Penalties

3. The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum | Special Assessment |
|---|---|---|---|---|---|---|

|   |   |   |   |   | Fine |   |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1366(a) | n/a | 20 years | Life | $250,000 | $100 |
| 2 | 18 U.S.C. § 922(g)(1) | n/a | 15 years | 3 years | $250,000 | $100 |

      a.    Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

      b.    Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

      c.    Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

      d.    Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

      e.    Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

      f.    Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

4.    The Defendant understands that by entering into this Agreement, the Defendant

3

surrenders certain rights as outlined below:

    a.    If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b.    If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c.    If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d.    The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e.    If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f.    By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

    g.    If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agree that the applicable United States Sentencing Guidelines ("U.S.S.G.") calculations are as follows:

### Conspiracy to Damage Energy Facilities

a. The base offense level for conspiracy to damage energy facilities is **seven (7)**. U.S.S.G. § 2B1.1(a)(1).

b. The parties do not agree how many levels must be added based on the total amount of intended loss within the meaning of U.S.S.G. § 2B1.1(b)(1) and Application Note 3(A)(ii) that would have occurred if the conspiracy had achieved its objective of damaging the energy facilities. The Defendant agrees and stipulates that the intended loss, at a minimum, was more than $100,000 and, therefore, at least **eight (8)** levels should be added under U.S.S.G. § 2B1.1(b)(1)(E). Both parties reserve the right to present evidence of the intended loss at the sentencing hearing.

c. The parties agree the offense level is further increased by **two (2) levels**, because the offense involved the conscious or reckless risk of death or serious bodily injury. U.S.S.G. § 2B.1.1(b)(16)(A).

5

d.  Because the offense was a felony that involved, or was intended to promote, a federal crime of terrorism, U.S.S.G. § 3A1.4 is applicable and the Defendant's Criminal History Category is VI. If the Court finds at sentencing that the intended loss exceeded $250,000, the offense level will be increased by **twelve (12)**. If the Court finds that the intended loss was less than $250,000, the offense level will be increased to **thirty-two (32)**. U.S.S.G. § 3A1.4(a) and (b).

<u>Felon in Possession of a Firearm</u>

a..  The parties do not agree on the applicable offense level. It is the government's position that the base offense level for a felon in possession of a firearm is **twenty-four (24)**, because the Defendant committed the offense subsequent to sustaining two felony convictions for a crime of violence. U.S.S.G. § 2K2.1(a)(2).

<u>Acceptance of Responsibility</u>

7.  This Office does not oppose a **two (2)** level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **one (1)** level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

8.  Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

<u>Obligations of the Parties</u>

9.  At the time of sentencing, both parties reserve the right to advocate for a reasonable sentence, including a term of incarceration, a period of supervised release, and/or a fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office further agrees that it will not recommend a sentence of imprisonment that exceeds eighteen (18) years. Both parties reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing.

### Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

    a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statutes to which the Defendant is pleading guilty are unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statutes, to the extent that such challenges legally can be waived.

    b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

        i. The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

        ii. This Office reserves the right to appeal any sentence below a statutory minimum.

    c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Defendant's Conduct Prior to Sentencing and Breach

11. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

12. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil

proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Court Not a Party

13. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

14. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to us promptly.

Very truly yours,

Erek L. Barron
United States Attorney

Kathleen O. Gavin
Michael Aubin
Assistant United States Attorneys

8

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

05-10-24
Date

_(signature)_
Sarah Beth Clendaniel

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

5/10/24
Date

_(signature)_
Sedira Banan, Esquire

9

## ATTACHMENT A

### STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Defendant Sarah Beth Clendaniel ("Clendaniel") was a resident of Catonsville, Maryland. Brandon C. Russell was a resident of Orlando, Florida. Russell and Clendaniel became acquainted by writing letters to each other beginning in about 2018, when both were serving prison sentences in different institutions. At some point, they developed a romantic relationship that continued after their respective releases from incarceration.

Beginning in or before December 3, 2022, and continuing until on or about February 3, 2023, Clendaniel and Russell conspired and agreed to knowingly and willfully damage and attempt to damage the property of energy facilities involved in the transmission and distribution of electricity, in an amount exceeding or which would have exceeded $100,000, and to cause a significant interruption and impairment of a function of an energy facility.

Clendaniel and Russell espoused a white supremacist ideology and were advocates of a concept known as "accelerationism." To "accelerate" or to support "accelerationism" is based on a white supremacist belief that the current system is irreparable and without an apparent political solution, and therefore violent action is necessary to precipitate societal and government collapse.

Beginning in about June, 2022, Russell, using the moniker "Homunculus," communicated over an encrypted communication application (ECA #1) with a Confidential Human Source ("CHS-1"). Among other things, Russell encouraged CHS-1 to carry out attacks against critical infrastructure in furtherance of the defendant's accelerationist ideology. He specifically encouraged CHS-1 to attack electrical substations and provided guidance on how to cause maximum damage, including as follows:

- On September 9, 2022, Russell told CHS-1 to read a white supremacist publication that provided instructions on how to attack critical infrastructure. Russell urged CHS-1 to use Mylar balloons to short out a power transformer;

- On October 14, 2022, Russell again talked to CHS-1 about the use of Mylar balloons for engaging in an attack on infrastructure. He then told CHS-1 that "putting holes in transformers though is the greatest thing somebody can do;"

- On October 25, 2022, after CHS-1 had provided Russell with photographs of an electrical substation, Russell stated that transformers are "custom made and could take almost a year to replace if there isnt [sic] any stocked replacement which they liekly [sic] dont

1

have." In that same conversation, Russell sent CHS-1 a link to the Wikipedia page for "Cascading failure." Russell went on to ask CHS-1 how cold it gets in CHS-1's area, and indicated that CHS-1 should carry out an attack "when there is greatest strain on the grid," like "when everyone is using electricity to either heat or cool their homes;" and

- On November 5, 2022, Russell asked CHS-1 if it was snowing in CHS-1's area yet and added: "i think you should wait until like a week after it starts snowing for that other thing we talked about." CHS-1 reported that the "other thing" was a reference to an attack on an electrical substation. Russell also stated that the "goal is for when most people are using max electricity" and that "follow on [attacks] could lead to cascading failure costing billions of dollars." CHS-1 replied with an emoji of a shocked rubber duck.

Then on December 3, 2022, Russell told CHS-1, "someone else i know in maryland…is gonna be doing same thing as you" and that this would "GREATLY amplify its effects." During the same conversation, Russell confirmed he was referring to the "thing [CHS-1] sent pictures about," a reference to the photographs of an electrical substation provided by CHS-1 in late October.

On January 12, 2023, CHS-1 discussed the planned substation attack and told Russell that CHS-1 wanted to "maximize impact" and "[w]ould love to coordinate to get multiple [substations] at the same time." CHS-1 also alluded to the concept of cascading failure that Russell had explained to CHS-1 during previous conversations. Russell asked CHS-1 to collaborate with a Maryland-based woman to carry out the attacks and confirmed that the woman was 100 percent "serious and can be trusted." Russell said that the woman was a "felon" who "had their weapon stolen" and was struggling to obtain a new weapon. Russell asked CHS-1 to assist the woman the new weapon. The woman that Russell referred to in this conversation, as well as in the December 3, 2022, conversation described above, was Sarah Beth Clendaniel.

Later that same day, Clendaniel, using the moniker "Nythra88," sent a message to CHS-1 on ECA #1. Clendaniel confirmed that she was the individual Russell was referring to in the previous conversation between Russell and CHS-1. In the ensuing conversation, which continued through January 14, 2023, Clendaniel told CHS-1 that she lived near Baltimore, that she had a terminal illness related to her kidneys and was unlikely to live more than a few months. She also stated that she was a felon, and had previously, but unsuccessfully, attempted to obtain a rifle. Clendaniel asked CHS-1 to purchase a rifle for her, stating that she wanted to "accomplish something worthwhile" before her death, and that she wanted the rifle "within the next couple of weeks" to "accomplish as much as possible before June, at the latest." Clendaniel then gave CHS-1 her user name, @kali1889, for a different encrypted communication application ("ECA #2), and said that they should have further communications using that application or that they should communicate in person.

On January 18, 2023, on ECA #2, Clendaniel told CHS-1 that she had already identified a few potential locations to target in her attack, including one just across the Delaware state line (with Maryland), in a location that is "literally like a life artery" and would "definitely cut out a lot of shit." When Clendaniel told CHS-1 that she had just obtained her driver's license "today"

2

and was not comfortable driving yet, CHS-1 stated that CHS-1 would have to be the "driver" and Clendaniel would have to be the "shooter" in the attack. Clendaniel confirmed that she was "determined to do this" and stated she would have done something earlier on her own if she had not lost her rifle "a few months ago." Clendaniel also told CHS-1 that she had an "eotech with a 4 times magnifier," which CHS-1 assessed to be a rifle optic, and that she had previously tried to obtain a rifle, a Smith & Wesson M&P 10 Sport, but that had fallen through. Clendaniel further stated that if CHS-1 provided her a rifle, CHS-1 should report the rifle as stolen and she would then file off the serial number. Clendaniel emphasized that her time frame for the attack was "no longer than a month."

The conversation continued shortly afterwards on ECA #1 after the ECA #2 call experienced technical problems. CHS-1 and Clendaniel continued to discuss the specifics of the desired rifle and agreed that Clendandiel would send CHS-1 a "wish list." Clendaniel admitted that whatever type of firearms she possessed would be "illegal." On or about January 19, 2023, Kali sent CHS-1 a wish list of items for her desired rifle that were available for online purchase, along with magazines.

On or about January 19, 2023, Russell and CHS-1 discussed CHS-1's conversation the prior day with Clendaniel, including her ability to participate in the attack due to her health problems and possibilities regarding acquiring or manufacturing a rifle for her. Russell told CHS-1 that he did not think CHS-1 and Clendaniel needed to be together at the same location during the attack. When CHS-1 asked whether they would need to attack substations near one other in order to achieve "cascading failure," Russell said it "depends." Russell further stated that he would "look at the map" and get back to CHS-1 about target facilities in a couple of days.

On January 21, 2023, CHS-1 exchanged encrypted messages, separately, with Clendaniel on ECA #2 and Russell on ECA #1 in which they discussed in more detail the rifle and specific accessories that Clendaniel wanted. The conversation with Clendaniel extended into January 22, 2023, at which time Clendaniel stated that she already had a "bunch of [.308] ammunition" and several magazines for a rifle. Clendaniel later clarified that she had a "few hundred rounds of ammunition." She also asked CHS-1 to provide her a "decent inner pants holster" for her "9mm" to replace her "other holster" which was a "drop leg holster" and therefore difficult to conceal.

On or about January 24, 2023, CHS-1 engaged in a nearly two-hour long conversation with Clendaniel. During the call, they discussed, among other things, the following:

- Clendaniel stated that she had threaded and non-threaded barrels for her Glock, which was functional after she purchased a new "slide" for it, and that she "keep[s] it on me now, like just in case." Clendaniel said she would send a picture of it to CHS-1 in the next day or two.

- Clendaniel discussed the ammunition she possessed, including .308 "full metal jacket" rounds, hollow point nine-millimeter rounds, and approximately 150-200 rounds of "Browning and Winchester." She also stated that she had a "Tri-Star" semi-automatic shotgun with a 10-round magazine that she could use instead of the desired rifle in the "worst case scenario."

3

- Clendaniel stated that her brother had some "incendiary rounds" with a green tip. Clendaniel suggested that, although the rounds were expensive, "getting that is, uh, I think especially for what we're talking about doing, just to make sure it's a solid thing and not just like the oil leaking out but like it's fully damaged."

- Clendaniel stated that she and CHS-1 needed to use "brass catchers," and she had thought about going to the firearms range to collect shells of different calibers, including .556, that they could spread "there" to send "them" on a wild goose chase.

- Clendaniel stated that she was hesitant to discuss targets of the attack with "Raccoon" (another alias for Russell) because "he has a lot to lose." She added: "He's not like your average regular one of us that's not known and that's like a faceless unknown person . . . I try not to involve him wherever possible." Clendaniel and CHS-1 discussed physically scoping out some potential attack sites during the first week of February.

- Clendaniel and CHS-1 further discussed Clendaniel's desired rifle for the attack.

On or about January 26, 2023, CHS-1 and Russell exchanged direct messages on ECA #1 during which CHS-1 advised he/she had tentatively decided to buy a "pre-made" rifle for Clendaniel instead of 3D printing one. Russell replied: "okay sounds good . . . everything else is fine too ;)'" When CHS-1 asked if Russell was referring to "location," meaning the specific substation that would be targeted, Russell replied "yes don't worry." CHS-1 stated: "Perfect. That's the part that I haven't really done anything on," to which Russell again replied: "yea don't worry."

On or about January 29, 2023, CHS-1 received a message on ECA #2 from Clendaniel in which she stated that it "would really be ideal, for us both to have 30 round mags. Especially for what we're doing." She asked CHS-1 to "please get us each like, 4 of them. For what I'm hoping to do, we will need them. If we can pull off what I'm hoping... this would be legendary. This is MAJOR tier, and definitely doable."

That same day, Clendaniel sent CHS-1 via ECA #2 a link to the publicly available webpage "Open Infrastructure Map" (https://openinframap.org) and instructed CHS-1 to "look at Baltimore and see if you can figure out what I want to do."

Later on January 29, 2023, Clendaniel told CHS-1 that the five substations she planned to target included: "Norrisville, Reisterstown, and Perry Hall." Clendaniel described how there was a "ring" around Baltimore and if they hit a number of them all in the same day, they "would completely destroy this whole city." She added that they needed to "destroy those cores, not just leak the oil…" and that a "good four or five shots through the center of them . . . should make that happen." Further, she stated that: "[i]t would probably permanently completely lay this city to waste if we could do that successfully." When CHS-1 asked if it would accomplish a "cascading failure," Clendaniel replied: "Yes . . . probably" and that the attack targets are all "major ones." Clendaniel also said that the most difficult target that they would have to do together has "fire walls on three sides."

4

During that conversation, Clendaniel sent CHS-1 five links to the "Open Infrastructure Map" which showed the locations of five specific Baltimore, Gas and Electric ("BGE") electrical substations in Maryland. BGE is an energy company that utilizes substations, like the five targeted sites, to produce, convert, transform, regulate and distribute energy. Three of the five substations were located near the towns of Norrisville, Reisterstown, and Perry Hall. The remaining two substations were in the vicinity of Baltimore City, MD. Each location is a BGE substation with significant infrastructure.

On or about January 31, 2023, CHS-1 and Russell discussed the targeted substations on ECA #1. CHS-1 told Russell that CHS-1 had "read about a few attempt [sic] recently that didn't have much effect, so I want to make sure it's done right." Russell replied "Yea, it has been studied . . . So don't fret." When CHS-1 asked "[t]hese specific 5?," Russell replied: "Look at the map dude." CHS-1 responded: "So that's the part I don't get. What's with the one all the way up by Pennsylvania? Does that have something to do with the cascading?" Russell replied: "Watch this video" and provided a YouTube link to a video captioned "Grid vs. Gunfire" that discussed "What Really Happened with the Substation Attack in North Carolina." After watching the video, CHS-1 commented that he/she is looking at the map and "I think I get it . . . But I only see four lines. Not fully getting the fifth. Is the one up north to stop rerouting? You know the one I'm talking about?" Russell replied: "Yrs [sic]... It's a hard one though . . . Look at it from google maps." After indicating he/she had pulled the location up on the map, CHS-1 replied "It looks like it's in a pretty rural area . . . Good road access . . . Wooded areas . . . I would like it to be closer to a major highway, but that has its ups and downs. Russell replied: "Yea . . . Hard part is they have 3 sided firewalls . . . Look at them." CHS-1 replied: "Oh shit. Yea this is that one. Our friend mentioned that one did but she didn't say which one." Clendaniel and Russell believed that attacking these five electrical substations in the greater Baltimore area would serve the purpose of accelerationism, i.e., the attack would serve to break down society.

If Clendaniel and Russell had succeeded in attacking the five electrical substations, the loss would have exceeded $100,000 and would have caused a significant interruption or impairment of a function of the facilities.

On February 3, 2023, law enforcement agents executed a search warrant at Clendaniel's residence in Catonsville, Maryland. During the search, agents recovered the following from Clendaniel's bedroom:

1. a semi-automatic 12 gauge TriStar (Kral) shotgun, Model Compact, bearing the serial number KRC003624, located on the bed;
2. a 9 x 19 (9mm Luger) Privately Made Firearm pistol, consisting of a Ploymer80 brand frame, Model PF940C, a Kineti-Tech brand slide, Style #9, and a barrel of unknown origin located in a dresser drawer;
3. a Glock-like P80 lower with slide located on a bedside table;
4. 3 Glock 9 mm magazines containing 12 rounds of ammunition in a tactical bag located on the floor; and
5. Ammunition, consisting of about 953 rounds of 7.62 mm, 559 rounds of 9 mm, and 77 shotgun shells, located in the closet.

Clendaniel's possession of the shotgun was in or affecting interstate commerce, because the shotgun was not manufactured in the State of Maryland. Both the shotgun and the 9 mm Privately Made Firearm were fully operable.

Clendaniel knowingly possessed the shotgun and the ammunition and knew that she had previously been convicted of an offense for which the punishment was more than one year of imprisonment. She was prohibited from possessing such items, because she had previously been convicted of the following offenses in the Cecil County Circuit Court of Maryland:

1. Robbery in violation of MD Code, Criminal Law, § 3-402, on May 15, 2006;
2. Robbery in violation of MD Code, Criminal Law, § 3-402, on April 4, 2016; and
3. Attempted Robbery in violation of MD Code, Criminal Law, § 3-402, on April 19, 2016.

SO STIPULATED:

_____
Kathleen O. Gavin
Michael Aubin
Assistant United States Attorneys

_____
Sarah Beth Clendaniel

_____
Sedira Banan, Esquire
Counsel for Defendant