**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **BRANDON RUSSELL** | * | **CRIMINAL NO. JKB-23-0056** |
| | * | |
| **Defendant.** | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR NEW TRIAL**

The United States of America, by and through undersigned counsel, hereby responds in opposition to defendant's Motion for New Trial, docketed at ECF 237.

As set forth more fully below, the motion should be denied.

## BACKGROUND

### 1. Procedural Background

On February 3, 2023, the defendant, Brandon Clint Russell, and his co-defendant, Sarah Beth Clendaniel, were indicted on one count of Conspiracy to Damage an Energy Facility, in violation of 18 U.S.C. § 1366(a).  ECF 1.

The defendant elected a jury trial, which was previously scheduled for July 8, 2024. ECF 68. Prior to that trial date, government counsel requested details from the FBI related to the payments for all confidential human sources testifying in the case, and provided that information to the defense. *See* Ex. 1. The trial was subsequently continued to November 12, 2024. *See* ECF 122. Before the November trial date, previous government counsel retired, additional new government counsel entered the case, and a continuance was granted moving the trial date to January 27, 2025. *See* ECF 191.

Prior to the commencement of the January trial, government counsel requested and received documentation from the FBI detailing the updated payment history for "Christopher Jackson" ("Jackson"), a compensated confidential human source who testified at trial.[1] *See* Ex. 2. Upon obtaining that information, undersigned counsel provided an updated notice to the defense dated January 21, 2025. *See* Ex. 3. This notice reflected payments in excess of $72,000.  The foregoing constitutes government counsel's understanding of payments to the witness by the FBI as of the time of trial.

## 2.  Facts Proven at Trial

The following facts were among those proven at trial and are derived from a memorandum provided by the government to the U.S. Probation Office concerning the forthcoming presentencing investigative report.

The defendant was a founding member of a National Socialist or Nazi organization called the "Atomwaffen Division," which advocated for racially or ethnically motivated violence. The defendant and Clendaniel espoused a white supremacist ideology and were advocates of a concept known as "accelerationism."

Accelerationism is an ideology that perceives Western governments as irreparably corrupt, dysfunctional, and controlled by foreign agents (i.e., minorities and their proxies) and thus represents a threat to the white race. Hence, groups committed to the cause of white supremacy should act to accelerate or expedite government collapse by sowing chaos and destabilizing the socio-political and economic systems. Such total collapse of Western society, according to accelerationist narratives, will be accompanied by war, which will end with the rebirth of a new political system committed to the preservation of the superior status of the white race.

---

[1] The witness testified under pseudonym at trial, pursuant to an Order of the Court docketed at ECF 135.

Beginning in or about June 2022, Jackson observed the defendant's messages and posts in group chats on Telegram, an encrypted communication application. The defendant used variations of the following monikers to communicate with Jackson and others: "Homunculus," "Ouroborous," and "Racoon". The individuals who communicated in these chat groups often referred to them as "Terrorgram."

Among other things, the defendant encouraged Jackson and others to carry out attacks against electrical infrastructure in furtherance of the defendant's accelerationist ideology. The defendant posted and directed others to download a publication titled "MAKE IT COUNT" which provided explicit instructions about how to commit acts of political violence, including, but not limited to, attacks on electrical substations. The defendant further repeatedly posted the publicly available webpage "Open Infrastructure Map" (https://openinframap.org), often subtly encouraging others to destroy the electrical substations listed at the respective geocoordinates. Multiple witnesses testified to observing the defendant posting the links.

Beginning in the summer through the winter of 2022, the defendant communicated directly with Jackson via direct message. He specifically encouraged Jackson to attack electrical substations and provided guidance on how to cause maximum damage, including the following:

- The defendant told Jackson to read a white supremacist publication that provided instructions on how to attack critical infrastructure. The defendant urged Jackson to use Mylar balloons to short out an electrical transformer;

- The defendant again talked to Jackson about the use of Mylar balloons for engaging in an attack on infrastructure. He then told Jackson that "putting holes in transformers though is the greatest thing somebody can do;"

- After Jackson had provided the defendant with photographs of an electrical substation, the defendant stated that transformers are "custom made and could take almost a year to replace if there isnt [sic] any stocked replacement which they liekly [sic] don't have." In that same conversation, the defendant sent Jackson a link to the Wikipedia page for "Cascading failure." the defendant went on to ask Jackson how cold it gets in Jackson's area, and indicated that Jackson should carry out an attack "when there is greatest strain on the grid," like "when everyone is using electricity to either heat or cool their homes;" and

- The defendant asked Jackson if it was snowing in Jackson's area yet and added: "i think you should wait until like a week after it starts snowing for that other thing we talked about." Jackson reported that the "other thing" was a reference to an attack on an electrical substation. The defendant also stated that the "goal is for when most people are using max electricity" and that "follow on [attacks] could lead to cascading failure costing billions of dollars." Jackson replied with an emoji of a shocked rubber duck.

On December 3, 2022, the defendant told Jackson, "someone else i know in maryland…is gonna be doing same thing as you" and that this would "GREATLY amplify its effects." During the same conversation, the defendant confirmed he was referring to the "thing [Jackson] sent pictures about," a reference to the photographs of an electrical substation provided by Jackson in late October.

On January 12, 2023, Jackson discussed the planned substation attack and told the defendant that he wanted to "maximize impact" and "[w]ould love to coordinate to get multiple [substations] at the same time." Jackson also alluded to the concept of cascading failure that the defendant had explained to Jackson during previous conversations. The defendant asked Jackson

4

to collaborate with a Maryland-based woman to carry out the attacks and confirmed that the woman was 100 percent "serious and can be trusted." The defendant said that the woman was a "felon" who "had their weapon stolen" and was struggling to obtain a new weapon. The defendant asked Jackson to assist the woman the new weapon. The woman that the defendant referred to in this conversation, as well as in the December 3, 2022, conversation described above, was Sarah Beth Clendaniel.

Later that same day, Clendaniel, using the moniker "Nythra88," sent a message to Jackson on Telegram. Clendaniel confirmed that she was the individual the defendant was referring to in the previous conversation between the defendant and Jackson. In the ensuing conversation, which continued through January 14, 2023, Clendaniel told Jackson that she lived near Baltimore, that she had a terminal illness related to her kidneys and was unlikely to live more than a few months. She also stated that she was a felon, and had previously, but unsuccessfully, attempted to obtain a rifle. Clendaniel asked Jackson to purchase a rifle for her, stating that she wanted to "accomplish something worthwhile" before her death, and that she wanted the rifle "within the next couple of weeks" to "accomplish as much as possible before June, at the latest." Clendaniel then gave Jackson her username, @kali1889, for Wire, a different encrypted communication application. Future communications occurred through both Telegram and Wire.

On January 18, 2023, through Wire, Clendaniel told Jackson that she had already identified a few potential locations to target in her attack, including one just across the Delaware state line (with Maryland), in a location that is "literally like a life artery" and would "definitely cut out a lot of shit." When Clendaniel told Jackson that she had just obtained her driver's license "today" and was not comfortable driving yet, Jackson stated that he would have to be the "driver" and Clendaniel would have to be the "shooter" in the attack. Clendaniel confirmed that she was

"determined to do this" and stated she would have done something earlier on her own if she had

not lost her rifle "a few months ago." Clendaniel also told Jackson that she had an "eotech with a

4 times magnifier," which Jackson assessed to be a rifle optic, and that she had previously tried to

obtain a rifle, a Smith & Wesson M&P 10 Sport, but that had fallen through. Clendaniel further

stated that if Jackson provided her a rifle, he should report the rifle as stolen and she would then

file off the serial number. Clendaniel emphasized that her time frame for the attack was "no longer

than a month."

The conversation continued shortly afterwards on Telegram after the Wire call experienced

technical problems. Jackson and Clendaniel continued to discuss the specifics of the desired rifle

and agreed that Clendaniel would send Jackson a "wish list." Clendaniel admitted that whatever

type of firearms she possessed would be "illegal." On or about January 19, 2023, Clendaniel sent

Jackson a wish list of items for her desired rifle that were available for online purchase, along with

magazines.

On or about January 19, 2023, the defendant and Jackson discussed on the telephone

Jackson's conversation the prior day with Clendaniel, including her ability to participate in the

attack due to her health problems and possibilities regarding acquiring or manufacturing a rifle for

her. The defendant told Jackson that he did not think Jackson and Clendaniel needed to be together

at the same location during the attack. When Jackson asked whether they would need to attack

substations near one other in order to achieve "cascading failure," the defendant said it "depends."

The defendant further stated that he would "look at the map" and get back to Jackson about target

facilities in a couple of days. Throughout the conversation defendant stressed the importance of

not sharing the nature of the plot with anyone because "no one wants be a plot failed n***a."

On January 21, 2023, Jackson exchanged encrypted messages, separately, with Clendaniel on Wire and the defendant on Telegram in which they discussed in more detail the rifle and specific accessories that Clendaniel wanted. The conversation with Clendaniel extended into January 22, 2023, at which time Clendaniel stated that she already had a "bunch of [.308] ammunition" and several magazines for a rifle. Clendaniel later clarified that she had a "few hundred rounds of ammunition." She also asked Jackson to provide her a "decent inner pants holster" for her "9mm" to replace her "other holster" which was a "drop leg holster" and therefore difficult to conceal.

On or about January 24, 2023, Jackson engaged in a nearly two-hour long conversation with Clendaniel. During the call, they discussed, among other things, the following:

- Clendaniel stated that she had threaded and non-threaded barrels for her Glock, which was functional after she purchased a new "slide" for it, and that she "keep[s] it on me now, like just in case." Clendaniel said she would send a picture of it to Jackson in the next day or two.

- Clendaniel discussed the ammunition she possessed, including .308 "full metal jacket" rounds, hollow point nine-millimeter rounds, and approximately 150-200 rounds of "Browning and Winchester." She also stated that she had a "Tri-Star" semi-automatic shotgun with a 10-round magazine that she could use instead of the desired rifle in the "worst case scenario."

- Clendaniel stated that her brother had some "incendiary rounds" with a green tip. Clendaniel suggested that, although the rounds were expensive, "getting that is, uh, I think especially for what we're talking about doing, just to make sure it's a solid thing and not just like the oil leaking out but like it's fully damaged."

- Clendaniel stated that she and Jackson needed to use "brass catchers," and she had thought about going to the firearms range to collect shells of different calibers, including .556, that they could spread "there" to send "them" on a wild goose chase.

- Clendaniel stated that she was hesitant to discuss targets of the attack with "Raccoon" because "he has a lot to lose." She added: "He's not like your average regular one of us that's not known and that's like a faceless unknown person . . . I try not to involve him wherever possible." Clendaniel and Jackson discussed physically scoping out some potential attack sites during the first week of February.

- Clendaniel and Jackson further discussed Clendaniel's desired rifle for the attack.

On or about January 26, 2023, Jackson and the defendant exchanged direct messages on Telegram during which Jackson advised that he had tentatively decided to buy a "pre-made" rifle for Clendaniel instead of 3D printing one. The defendant replied: "okay sounds good . . . everything else is fine too ;)" When Jackson asked if the defendant was referring to "location," meaning the specific substation that would be targeted, the defendant replied "yes don't worry." Jackson stated: "Perfect. That's the part that I haven't really done anything on," to which the defendant again replied: "yea don't worry."

On or about January 29, 2023, Jackson received a message on Wire from Clendaniel in which she stated that it "would really be ideal, for us both to have 30 round mags. Especially for what we're doing." She asked Jackson to "please get us each like, 4 of them. For what I'm hoping to do, we will need them. If we can pull off what I'm hoping... this would be legendary. This is MAJOR tier, and definitely doable."

That same day, Clendaniel sent Jackson via Wire a link to openinframap.org and instructed Jackson to "look at Baltimore and see if you can figure out what I want to do."

Later, on January 29, 2023, Clendaniel told Jackson that the five substations she planned to target included: "Norrisville, Reisterstown, and Perry Hall." Clendaniel described how there was a "ring" around Baltimore and if they hit a number of them all in the same day, they "would completely destroy this whole city." She added that they needed to "destroy those cores, not just leak the oil…" and that a "good four or five shots through the center of them . . . should make that happen." Further, she stated that: "[i]t would probably permanently completely lay this city to waste if we could do that successfully." When Jackson asked if it would accomplish a "cascading failure," Clendaniel replied: "Yes . . . probably" and that the attack targets are all "major ones." Clendaniel also said that the most difficult target that they would have to do together has "fire walls on three sides."

During that conversation, Clendaniel sent Jackson five links to the "Open Infrastructure Map" which showed the locations of five specific Baltimore, Gas and Electric ("BGE") electrical substations in Maryland. BGE is an energy company that utilizes substations, like the five targeted sites, to produce, convert, transform, regulate and distribute energy. Three of the five substations were located near the towns of Norrisville, Reisterstown, and Perry Hall. The remaining two substations were in the vicinity of Baltimore City, MD. Each location is a BGE substation with significant infrastructure. Clendaniel further referenced the virtual privacy Network ("VPN") Mullvad.

On or about January 31, 2023, Jackson and the defendant discussed the targeted substations on Telegram. Jackson told the defendant that Jackson had "read about a few attempt [sic] recently that didn't have much effect, so I want to make sure it's done right." The defendant replied "Yea, it has been studied . . . So don't fret." When Jackson asked "[t]hese specific 5?," the defendant replied: "Look at the map dude." Jackson responded: "So that's the part I don't get. What's with

9

the one all the way up by Pennsylvania? Does that have something to do with the cascading?" The defendant replied: "Watch this video" and provided a YouTube link to a video captioned "Grid vs. Gunfire" that discussed "What Really Happened with the Substation Attack in North Carolina." After watching the video, Jackson commented that at that moment he was looking at the map and "I think I get it . . . But I only see four lines. Not fully getting the fifth. Is the one up north to stop rerouting? You know the one I'm talking about?" The defendant replied: "Yrs [sic]… It's a hard one though . . . Look at it from google maps." After indicating Jackson had pulled the location up on the map, Jackson replied "[i]t looks like it's in a pretty rural area . . . Good road access . . . Wooded areas . . . I would like it to be closer to a major highway, but that has its ups and downs. The defendant replied: "Yea . . . Hard part is they have 3 sided firewalls . . . Look at them." Jackson replied: "Oh shit. Yea this is that one. Our friend mentioned that one did but she didn't say which one." Clendaniel and the defendant believed that attacking these five electrical substations in the greater Baltimore area would serve the purpose of accelerationism, i.e., the attack would serve to break down society, start a race war, and allow a white ethnostate to be built back in its place.

On February 3, 2023, federal agents conducted a search of the defendant and his home, and placed him under arrest. As a result of that search, numerous devices belonging to the defendant were seized and searched, including a cellular phone, an external hard drive, a USB drive, a laptop, several nazi/white nationalist artifacts, several drawings depicting nazi/white nationalist imagery, several photographs of Clendaniel, Neo-Nazi literature, various letters written by Clendaniel and addressed to the defendant, and a handwritten autobiography of the defendant, among other things.

Contemporaneous to the defendant's search and arrest, federal agents conducted a search of Clendaniel and her home, and she was ultimately arrested. The searches yielded multiple cellular

phones, a laptop, multiple varieties of firearm ammunition and firearms accessories, and various letters addressed to the defendant.

Multiple expert witnesses testified at trial, including a witness from BGE, who opined that the repair and replacement costs related to the damage of the five BGE substations, had the plot been realized, would have totaled in excess of $65,000,000.

### 3.  Additional Information Obtained by Government Counsel After Trial

Government counsel learned on March 7, 2025, that the FBI had made a payment to Jackson the first day of jury selection.  Government counsel was previously unaware of the payment, and so had not disclosed it to the defense at the time of trial. Government counsel made requests for information concerning the payment in the subsequent days. Government counsel advised Counsel for the defendant of the payment on March 14, 2025, and provided additional information on March 17, 2025.

Concerning the payment itself, government counsel learned the following information from the FBI during and after a March 7, 2025 telephone call regarding an unrelated matter with the FBI agent handling the witness.

On January 22, 2025, a request was made internally, within the FBI, to pay the witness funds for a service payment and expenses incurred as a result of the witness' travel in preparation for trial in the instant case. That request, which included $5,000 for services and $2,180.11 for expenses, was approved a short time thereafter. The FBI then paid the witness $7,180.11 during the evening of January 27, 2025, after the conclusion of the first day of jury selection. The witness testified on January 29, 2025.

Furthermore, during the March 7, 2025, call, the handling agent notified undersigned counsel that an additional request had been made that day to provide the witness financial

compensation for services related to several investigations in which he had contributed, including his work in the instant case. The payments were for services performed by the witness between December 2023 and January 2025, for which the witness had not previously been compensated. *See* Ex. 2.

According to the FBI, the witness had been aware that he might receive an additional payment for his cumulative work on various investigations. However, the witness was unaware of the amount of money, if any, he was likely to receive and is currently unaware that funds have been requested to make a payment to him. The request for funds was made by the handling agent earlier in the day of March 7, 2025, the same day of the conversation between government counsel and the FBI. This request is still pending FBI supervisory approval. Additionally, according to the FBI, and as reflected in the relevant FBI policy, no payment was ever expressly or impliedly conditioned on the conviction or punishment of the defendant.

Government counsel subsequently requested information from the FBI related to payments, including the dates of the requests, payment schedules, and whether the payments were for services rendered or expense reimbursement. The FBI provided information relevant to the inquiry on March 13 and 14, 2025, including an updated accounting of payments made to the witness. *See* Ex. 4.  This information was thereafter provided to counsel for the defendant on March 17, 2025.

On March 18, 2025, government counsel received a copy of the transcript of testimony of the witness and the defense closing. *See* Ex. 5. Relevant to the instant motion, the witness briefly referenced payments made to him by the FBI upon questioning by the government. He noted the following:

> "I've received approximately $70,000. However, about 40,000 of
> that was actual payment; 30,000 was reimbursements for various
> expenses that I've had in the course of this work."

Ex. 5 at 3. Defense counsel inquired regarding the payments as well. During cross examination of

the witness, the following colloquy ensued:

> **Defense Counsel:** Okay. At the time, were you told that you were going to be paid for your
>
> services?
>
> **The Witness:** I understood there might be compensation. However, it was made clear that
>
> it would be irregular and there was no formal agreement for payment.
>
> **Defense Counsel:** Okay. So you testified on direct examination that you were paid
>
> approximately $70,000; is that correct?
>
> **The Witness:** I actually -- 30,000 of that was, as I described, reimbursements. In terms of
>
> what I actually, for lack of a better term, put in the bank, it would be around $40,000.
>
> **Defense Counsel:** Okay. So you spent $30,000 out of your pocket working on this case?
>
> **The Witness:** Not just on this case, sir. That was over the course of four years.
>
> **Defense Counsel:** Okay. So those numbers don't just apply to this investigation? You were
>
> doing other work?
>
> **The Witness:** Correct.

Ex. 5 at 6-7.

Defense counsel made the following statement during closing argument, "I told you that

the evidence would show that this conspiracy consisted of two individuals, Sarah Clendaniel and

a person working for the government who we now know as Mr. Jackson, **an individual the**

**government paid tens of thousands of dollars for working for the FBI** in an effort to trap

Brandon Russell to make him a part of this conspiracy." Ex. 5 at 9. (emphasis added).

On February 3, 2025, following a six-day jury trial, the jury returned a verdict of guilty in approximately 50 minutes on the sole count of the Indictment. ECF 231.

## LEGAL FRAMEWORK

Rule 33 of the Federal Rules of Criminal Procedure authorizes the Court to grant a new trial only, "if the interest of justice so requires." Fed.R.Crim.P. 33. The Fourth Circuit has held that such instances occur, "when the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *United States v. Arrington*, 757 F.2d 1484 (4th Cir, 1985). Whether to grant a motion for a new trial is within the broad discretion of the Court but should only be disturbed in very limited instances. *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003).

In order to obtain a new trial as a result of newly discovered evidence, a criminal defendant must establish the following: (1) the evidence is newly discovered; (2) they exercised due diligence in discovering the evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to the issues; and (5) the evidence would probably result in an acquittal at a new trial. *United States v. Chavis*, 880 F.2d 788, 793 (4th Cir. 1989). All five elements must be present before a trial court can grant a new trial. *United States v. Singh*, 54 F.3d 1182, 1190 (4th Cir. 1995) ("Without ruling out the possibility that a rare example might exist, we have never allowed a new trial unless the defendant can establish all five elements").

With regard to the defense claims concerning *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), a defendant must show that non-disclosed evidence was (1) favorable to the accused, either because it was exculpatory or impeaching; (2) material to the verdict at trial; and (3) suppressed by the prosecution (i.e., the prosecution had it but failed to disclose it). *United States v. Chavez*, 894 F.3d 593, 600 (4th Cir. 2018).

14

## ARGUMENT

**1.  The Defendant Is Not Entitled To A New Trial Under Either Theory.**

Though the defendant satisfies the threshold of obtaining newly discovered evidence, and exercising due diligence in seeking a new trial, he does not come close to satisfying any of the additional requirements to warrant a new trial. There is nothing to suggest that the evidence is anything more than cumulative or impeaching, none of the evidence is material to the issues presented at trial, and there is no credible showing that the inclusion of such evidence at trial likely or probably would have resulted in an acquittal.

Moreover, the witness' approximation concerning the amount of money received from the FBI was sufficient to allow defense counsel to cross examine him and does not come close to rising to the level of perjury claimed by the defense.

**a.  The Evidence is Solely Impeachment.**

The evidence upon which the defendant relies is, at best, impeachment. Impeachment evidence cannot justify or support a motion for a new trial. *United States v. Stockton*, 788 F.2d 210, 220 (4th Cir.1986) (newly discovered evidence that would impeach entirety of grand jury testimony of witness not sufficient to grant a new trial); *see also United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir.1993) (reversing district court's grant of new trial based on newly discovered impeachment evidence).

As the Court will recall prior to trial, there was extensive litigation concerning the need to protect the personal identifying information of Jackson and other witnesses. *See* ECF 99, 102, 135, 203, 204, 206, 221. The government proffered to the Court in its initial Motion for Protective Order the following:

> [e]ach of the undercover witnesses' testimony will consist of a
> description of online conversations with Russell and relevant chats,

online postings and comments made by Russell that they personally observed. All of those online communications were captured by the witnesses in the form of screenshots or computer captures; images that the government expects to introduce into evidence. [Jackson] will also testify about his voice conversations with Russell and Clendaniel, all of which were recorded and will be offered into evidence as well. Accordingly, the undercover witnesses' testimony will not hinge on their credibility in any way, because the conversations and online communications with Russell and Clendaniel are objectively verifiable. The defendant would gain nothing relevant or beneficial if he were permitted to cross-examine the undercover witnesses about personally identifying information or ongoing investigations with which one or more of the witnesses may be involved.

ECF 102 at 13-14. During the corresponding motions hearing, the Court probed the ability of the government to adhere to the proposed strict protocol in questioning witnesses, and the government assured the Court that it would do so. The Court, after additional briefing, ultimately issued the Protective Order. ECF 135.

Jackson, and other similarly situated witnesses were allowed to testify under pseudonym, utilize a nonpublic entrance to enter the courtroom, and wear light disguises. The substance of their testimony comported with the limitations set forth in the Order.

Specifically with regard to Jackson, his testimony consisted of the authentication of pictures of messages, and recorded phone calls between the defendant, the defendant's co-conspirator and himself. Despite the substance of the testimony, the defendant was afforded the opportunity to probe the witness' financial motivations to testify. The defense did just that on cross examination, and argued that "tens of thousands of dollars" served as one of the bases for Jackson to testify favorably for the government.

Jackson acknowledged that he had received payments for his work and for expenses on multiple cases, including the instant case. He further informed defense counsel and the jury on

16

cross examination that during his four years as a confidential human source, "it was made clear that [payments] would be irregular and there was no formal agreement for payment."

This is the context in which the disclosure is relevant. The information about payments made and the prospect of future payments is solely cumulative impeachment evidence. This is not a case in which a confidential human source claimed to have received no payments, only for it to later be uncovered that he received in excess of tens of thousands of dollars. *See United States v. Atkinson*, 429 F. Supp. 880, 882 (E.D.N.C. 1977) (holding that a newly discovered arrest record showing multiple convictions when the witness testified that he had never been convicted of a serious criminal offense warranted a new trial). Nor is this a case where the witness provided factual information about the substance of the case that was later determined to be false or materially incorrect. *See United States v. Blackwell*, 436 F. App'x 192, 198 (4th Cir. 2011) (citing *United States v. Hanoum*, 33 F.3d 1128, 1130 (9th Cir.1994)) ("A Rule 33 motion based upon 'newly discovered evidence' is limited to where the newly discovered evidence relates to the elements of the crime charged."); *see also United States v. Ali*, 991 F.3d 561, 571 (4th Cir. 2021) (explaining that a declaration questioning the honesty of a testifying co-conspirator concerning whether he discussed his testimony with other witnesses during trial was 'orthogonal' to the a consideration of guilt, and "classic impeachment evidence that cannot satisfy the third prong of the *Chavis* test.").

Here, the defense was provided pretrial notice of payments. The witness provided an approximate payment that was close to the amount of money received and discussed his understanding of his agreement for payment with the FBI. The payment does not change the nature or veracity of the evidence testified to or introduced at trial because everything that the witness testified about was corroborated by documentary evidence. Additionally, the financial motivation

for the witness to testify was properly addressed through cross examination and argued to the jury in closing.

Because the evidence at issue is, at best, impeaching, a new trial is not warranted.

**b.  The Evidence is Not Material and Likely Would Not Have Resulted in an Acquittal at a New Trial.**

Whether in the context of a new trial motion pursuant to Rule 33, or under the *Brady/Giglio* doctrine, evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id*. Evidence is material if is "likely to have changed the verdict." *See Moseley v. Branker*, 550 F.3d 312, 318 (4th Cir. 2008); *United States v. Wilson*, 624 F.3d 640, 661 (4th Cir. 2010); *see also Winston v. Kelly*, 592 F.3d 535, 556 (4th Cir. 2010) ("[T]he materiality element of a Brady claim requires a collective assessment of whether introduction of the exculpatory evidence might have affected the outcome of the trial.").

With regard to an allegation of a false statement, the trial court must look to the importance of the witness's testimony, and the weight of independent evidence supporting a finding of guilt. *Boone v. Paderick*, 541 F.2d 447, 451 (4th Cir. 1976). In *Boone*, a habeas petition related to a state prosecution, the prosecutor deliberately withheld information concerning the promise of leniency for an accomplice for agreeing to testify at trial, only to then knowingly misrepresent that the witness had an altruistic motivation to testify during closing argument. *Id*. at 450. The witness ultimately testified against the defendant but denied that such an agreement took place. *Id*. at 449. The Fourth Circuit held that the existence of the undisclosed agreement coloring the testimony,

combined with a lack of physical evidence tying the defendant to the crime, created a reasonable likelihood that the judgment of the jury would have been affected. *Id.* at 453.

Here, however, the evidence against the defendant was overwhelming, and largely introduced in the form of unimpeachable documentary evidence. *See United States v. Robinson*, 627 F.3d 941, 953 (4th Cir. 2010) (holding that evidence of unrelated misconduct on the part of testifying officers could not outweigh the extensive physical and testimonial foundation of the case); *see also United States v. Banks*, 104 F.4th 496, 512 (4th Cir. 2024) (indicating that documentary evidence or the corroboration of testimony by another officer rendered the undisclosed misconduct of a testifying officer immaterial).

To be clear, the government does not concede or suggest the conduct of the witness was nefarious in any respect, however, given the nature and weight of the evidence, even if the Court were to find so, it would not be reasonable to presume that the outcome of the proceedings would have changed if such evidence were presented to the jury.

To begin, the government presented over a dozen witnesses at trial. They were comprised of two confidential human sources, seven FBI employees, three expert witnesses, and an employee of SITE Intelligence Group. Consistent with the government's pretrial assurances to the Court, it painstakingly presented over 200 exhibits of objectively verifiable evidence through its witnesses. Jackson accounted for approximately 50 of those exhibits.

Two of the three expert witnesses provided much needed experiential and empirical evidence to the jury in the form of data related to the probability of damaging substation transformers if the plot were successful, and the costs associated with repairing and replacing them. Dr. Arie Perliger's testimony was of particular significance. He testified extensively about the defendant's promotion of the white supremacist ideology known as "accelerationism." His

testimony detailed the efforts of white supremacist groups, like those promoted by the defendant, to advocate for the destruction of the power grid to cause a race war. He explained the importance of secrecy among the loosely connected network of likeminded Neo-Nazis, and the emphasis they placed on harming areas with largely urban or diverse populations. This testimony provided a framework to review the physical evidence presented by the subsequent witnesses.

FBI Digital Forensic Examiner Andrea Bedford testified about the defendant's electronic devices. The devices, which were obtained from the defendant's person and directly from his home, provided attribution information concerning his online aliases like "Homunculus," "Ouroborous," and "Racoon;" supported the notion that the defendant espoused white supremacist beliefs; and corroborated documentary evidence obtained from other witnesses.

Documents like "MAKE IT COUNT," a publication which provided explicit instructions about how to commit acts of political violence, including, but not limited to, attacks on electrical substations were located on the defendant's devices. The defendant zealously promoted the publication in Telegram group chats captured in photographs or screen shots taken by multiple witnesses. The defendant commented that he was the first to ever post it anywhere online. Consistent with that assertion, one of the defendant's devices contained what appeared to be a draft copy of the publication.

Other documentary evidence taken from the defendant's devices included several electronic versions of nazi/white nationalist literature like the book Siege by James Mason, an analysis of the Metcalf Sniper Shooting in which a group of individuals fired on electrical transformers at a substation located near San Jose, California, a digital version of the defendant's autobiography, digital images depicting nazi/white nationalist imagery, digital images of the defendant and Clendaniel embracing, digital images of items relevant to electrical infrastructure,

and communications repeatedly advocating attacks on electrical infrastructure including the repeated posting of openiframap.org.

FBI Special Agent Terryann Burns also testified about evidence obtained from an electronic device attributed to Clendaniel. Located within the device, there were several items of evidentiary value that corroborated the evidence introduced through Jackson, including communications between Clendaniel and Jackson concerning the plot to destroy electrical substations communications and Clendaniel's desire for a straw purchase of a firearm. The device also contained communications between Clendaniel and the defendant from January 29, 2023 in which the defendant provided a map instructing Clendaniel to save it and indicating that he deleted it from his computer, references to Clendaniel calling Jackson, and the use of the VPN Mullvad.

In addition to Jackson, the jury also heard from two other confidential human sources, including one who worked for the FBI and, another who, like Jackson, participated in telegram chats with the defendant. They, like Jackson, testified exclusively about the evidence obtained through photographs of messages and audio recordings of the defendant.

"Jacob Thompson" read messages of the defendant showing a picture of an electrical substation and indicating that "[t]he most effective thing would be to put a 308 right in its side, severing the windings and shorting it out that way." Another photograph captured by Thompson in December 2022, roughly a month before the defendant's plot was foiled, revealed a link to openinframap.org, and a veiled request for "someone to turn the power off for the whole city" of San Antonio, Texas.

During his testimony, FBI employee "Thomas Smith" recounted the efforts made by the defendant to recruit him to perform destructive acts on behalf of the national socialist cause. Smith read communications from the defendant urging him to do "something destructive" like "the mylar

balloon thing."[2] Screen captures of a video entitled "Be a Man of Action" proselytizing the destructive work of Neo-Nazis, and another depicting the "Garden"[3] publication provided further proof of the defendant's desire to cultivate an army of individuals to destroy electrical substations. Smith also recorded a conversation with the defendant concerning an effort to create a Neo-Nazi radicalization recruitment video.

SITE Intelligence employee "Allison Roberts" further introduced exhibits depicting messages of the defendant, including one that reflected the same message captured by Jackson, which read "I'll say this though, I wish these people would instead go for substations. Like the metcalf sniper attack."[4]

In assessing the collective testimony and evidence introduced at trial, it is clear that Jackson's testimony, though important, accounts for only a fraction of the evidence supporting the defendant's conviction, and is corroborated by dozens of exhibits of documentary evidence introduced through him and others. Jackson's entire testimony is a recitation of messages captured either with photographs or recorded by audio. It is through these messages that the jury learned the defendant, who had previously only communicated through larger chat groups, began communicating directly with Jackson. The disclosure of the payment or prospect of payment does not change this evidence. *See Robinson*, 627 F.3d at 949 (noting that the testimony of a dismissed officer was "amply corroborated" by other witnesses, and did not relate to the case or the truth-finding function of the criminal proceeding).

---

[2] The defendant repeatedly circulated a video titled "Crime Pilled" which depicted the use of mylar balloons to destroy power lines.
[3] Garden is a publication that provides a guidebook to performing attacks against electrical substations, including an analysis of the Metcalf sniper attack.
[4] Government's Exhibits 103 and 1001 both capture the statement and corresponding dialogue.

Moreover, the defense took every opportunity to probe and ultimately argue that the witness had a bias against the defendant, and financial motive to testify at trial. As referenced *supra*, during cross examination, the defense suggested through questioning that the witness received financial compensation just for the instant case. EX. 5 at 6. The witness was also repeatedly accused of being directed by the FBI to converse with the defendant, and to "pump him for information." *See* ECF 234 at 119, 122.

The defense made these contentions part of their theme. The closing argument suggested that the witness was an FBI plant, manipulated by them and paid "tens of thousands of dollars" to "get" or "trap" the defendant. EX. 5 at 9. It further painted the witness and Clendaniel as the true conspirators, while arguing that the defendant was a "cheerleader" who hoped that the plot would succeed, but he would do so from afar. *See* ECF 233 at 4-5.

It is confounding then that the defendant claims that further inquiry into additional payment could or would make his case stronger. Especially in light of the fact that the defendant effectively conceded that he made the comments attributed to him.[5] The mountain of evidence makes clear that whether cumulative impeachment evidence was disclosed and argued to the jury is of little significance to the jury. It was and remains immaterial.

Still, the jury heard on multiple occasions about the thousands of dollars paid to the witness. The jury heard about the witness's motivations to testify. They were unmoved by any of it, and returned a verdict in less than an hour.

Because the newly discovered evidence is immaterial to the substance of the case and likely would not have affected the outcome, the Court should deny the motion on these grounds.

---

[5] "As I told you, Brandon did provide information, however, every single bit of information that Brandon Russell supplied to Mr. Jackson or Ms. Clendaniel was publicly available." ECF 233 at 10.
information.

## CONCLUSION

For all of the above reasons, the government requests that the defendant's Motion for New Trial be denied.

<div style="margin-left:40%">

Respectfully submitted,

Kelly O. Hayes
United States Attorney

</div>

By:        /s/
<div style="margin-left:40%">

Michael F. Aubin
Joseph A. Baldwin
Assistant United States Attorneys

</div>