**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **BRANDON RUSSELL** | * | **CRIMINAL NO. JKB-23-0056** |
| | * | |
| **Defendant.** | * | |
| | * | |

**\*\*\*\*\*\*\***

<u>**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**</u>

The United States of America, by its undersigned attorneys, submits this memorandum in support of the sentencing of the defendant, Brandon Russell.

<u>**PROCEDURAL BACKGROUND**</u>

On February 14, 2023, the defendant, Brandon Clint Russell, and his co-defendant, Sarah Beth Clendaniel, were indicted on one count of Conspiracy to Damage an Energy Facility, in violation of 18 U.S.C. § 1366(a). ECF 25. The defendant elected a jury trial, which commenced on January 27, 2025. ECF 215. On February 4, 2025, the defendant was found guilty of the sole count of the Indictment. ECF 231. The defendant is scheduled to appear for sentencing on August 7, 2025, at 1:00 p.m. ECF 245.

<u>**ARGUMENT**</u>

Brandon Russell is a clear and present threat to all who reside in the United States. This is not hyperbole. His ideology, and, more importantly, his actions reflect a willingness to harm those who do not look like him or share his viewpoint. He seeks to destroy the very fabric of society. As his conduct before and after the conviction demonstrates, there is nothing that will stop him.

Accordingly, pursuant to 18 U.S.C. § 3553(a) and consistent with the advisory guideline calculation set forth in the Presentence Investigation Report, the government requests that the

1

Court sentence him to the maximum allowable sentence, twenty years. Such a sentence is sufficient but not greater than necessary to comply with the aims of sentencing.

### A.  Statutory Maximum Sentence and Term of Supervised Release

The statutory maximum term of imprisonment for Conspiracy to Damage an Energy Facility is 20 years. Pursuant to 18 U.S.C. § 3583(b)(2), the Court is generally constrained to impose a period of no more than three years of supervised release. However, pursuant to 18 U.S.C. § 3583(j), the Court may impose any term of years or life if the Court determines that the defendant's crime is a "federal crime of terrorism" as defined by 18 U.S.C. § 2332b(g)(5), referenced infra.

### B.  Sentencing Guidelines Calculation

The Probation Office has calculated the total offense level, after acceptance of responsibility, as 43.  PSR ¶ 43.[1]   The government agrees with this calculation and asks that the court adopt the Presentence Investigation Report's guidelines calculation at the time of sentencing.

### i.    Criminal History Category & Guideline Sentence

The government contends that the defendant is a criminal history category VI.  *See* USSG § 3A1.4(b). Because the total offense level, after acceptance of responsibility, is 43, an Adjusted Base Offense Level of 43 and any criminal history yields a guideline range of life imprisonment. Since the maximum sentence for the offense of conviction is 20 years, the guideline range is 20 years.  PSR ¶ 94.

### C.  Terrorism Enhancement

The terrorism enhancement, as described in USSG § 3A1.4, is applicable here. The

---

[1] The PSR reflects an offense level of 45 (beyond the highest offense level of 43 in the sentencing table).  However, pursuant to Chapter Five, Part A, Application Note 2, any offense level over 43 is treated as a level 43 for guidelines purposes.  Irrespective of the inclusion of the terrorism enhancement, the final guideline will remain the same.

defendant's conspiracy with Clendaniel "involved, or was intended to promote, a federal crime of terrorism." USSG § 3A1.4(a).

18 U.S.C. § 2332b(g)(5) defines a federal crime of terrorism as a crime that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct;" and is otherwise a violation of an offense enumerated in 18 U.S.C. § 2332b(g)(5)(B). *See United States v. Hassan*, 742 F.3d 104, 149 (4th Cir. 2014).

18 U.S.C. § 1366 is clearly enumerated under 18 U.S.C. § 2332b(g)(5)(B)(i), which leaves the Court with only the factual determination to support the first element. The government has the burden of proving this element by a preponderance of the evidence. *United States v. Chandia*, 675 F.3d 329, 339 (4th Cir. 2012). This element further requires that the defendant act with specific intent. *Hassan*, 742 F.3d at 148. The Fourth Circuit has stated that "[t]o make this determination, the [district] court must resolve any factual disputes that it deems relevant to application of the enhancement," and "identify the evidence in the record that supports its determination." *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008).

In *United States v. Young*, 818 F. App'x 185 (4th Cir. 2020), the Fourth Circuit affirmed the application of the terrorism enhancement where the defendant was convicted of providing material support to a foreign terrorist organization when he purchased Google gift cards for an undercover informant purporting to travel to Syria to join ISIL. The defendant transferred money for the informant to purchase accounts for an encrypted messaging service to recruit additional fighters. *Young*, 818 F. App'x at 189. The Court held that the evidence established that the appellant did more than just accommodate a friend, but rather "demonstrated his support for and intent to advance ISIL's purpose." *Young*, 818 F. App'x at 193. The Court reasoned that the district court properly addressed facts that supported the contention, including that the appellant knew the

3

informant planned to travel to join ISIL, purchased cards that he knew were intended to be used by ISIL, and did so after acknowledging that the cards would be used to solicit additional fighters. *Id*.

In the instant case, the Court applied the terrorism enhancement to the guidelines of the co-defendant. *See* ECF 167 ¶ 58. Clendaniel's agreed conduct, though inclusive of her efforts to obtain a firearm, effectively mirrored the conduct of the defendant.

Their shared rhetoric underscored a longstanding desire to overthrow the government and to replace it with one in the image of the Third Reich. The trial record is replete with examples of this. Government's Trial Exhibit 21, an excerpt of a manuscript located in one of the defendant's hard drives provides one of the clearest examples. It characterizes the governance of the United States as "an enemy occupation" and explains that the "nation was born through blood; it shall die in blood." It even parroted much of the language used in the vaunted "Make It Count" publication, noting that revolutionary groups in World War II attacked electrical power grids, and stressed that if someone is going to act for their cause, they should "make it really count!"

The defendant saw the conspiracy to damage five substations in the Baltimore metropolitan region as a means to effect this revolution. In Make it Count, the "Black Out" page provides another clear example of the defendant's intent and motivation. There, with an image of a sniper rifle in the foreground, the defendant noted the following

> It is easiest to attack any of these substations. You can lookup the locations of them based on your state. Create lawlessness and chaos. Only from the ashes of the kike system will we be able to build a new beautiful world.

Government's Trial Exhibit 14.

As the jury found, the defendant's conduct went beyond just rhetoric. He made attempts to locate firearms to achieve the goal. *See* Government's Trial Exhibit 119, (asking CHS-1 if he can

help Clendaniel procure a firearm); Government's Trial Exhibit 124, (asking Confidential Human Source 1 ("CHS-1") if he has started printing a firearm, and inquiring about the use of a "Hoffman" style rifle capable of shooting .308 ammunition); Government's Trial Exhibit 127 (following up on the firearm print request); Government's Trial Exhibit 701-A-G (a series of messages between the defendant and Clendaniel with the defendant providing website links to firearms for Clendaniel to purchase).

The defendant was also involved in tactical planning. *See* Government's Trial Exhibit 114 (providing analysis of the points of vulnerability for specific substations in Maryland); Government's Trial Exhibit 127 (explaining that the specific locations of substations have been studied, and providing guidance to avoid structural barriers). All of these efforts were in support of his desire "build a beautiful new world."

Because the record of the defendant's desire to "influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct;" the Court should apply the terrorism enhancement.

### D.  18 U.S.C. § 3553(A) Factors Demonstrate that the Defendant Should be Sentenced to 20 Years' Imprisonment.

#### i.    The Nature and Circumstances of the Offense are Reprehensible.

The defendant sought to destroy the power grid of a major American city. The scale and scope of such an act is truly difficult to comprehend and can only rival the actions of a fictional movie villain. The defendant's obsession with these acts of political violence, however, are very real. What's more, his efforts to realize this plot were deliberate, coordinated, and secretive.

Through the second half of 2022, the defendant began to groom multiple subjects to do his bidding. For the defendant this was a common practice, and given his status as a federal supervisee,

he was mindful of the need for plausible deniability. The testimony of both individuals who personally interacted with the defendant, CHS-1 and the Online Covert Employee ("OCE"), reflected this desire and effectively mirrored one another.

OCE provided testimony highlighting the defendant's desire to keep his identity hidden, the defendant encouraged the OCE to commit random acts of destruction, and the defendant repeatedly sent media designed to indoctrinate the OCE. *See* Government's Trial Exhibit 300, 305, and 306.

Similarly, the defendant provided CHS-1 reading materials that outlined the use of various devices to destroy parts of the electrical grid, provided links to websites and videos detailing the destruction of aspects of the power grid, and personally instructed CHS-1 about how to carry out the plot without getting caught. *See* Government's Trial Exhibit 112-14.

The defendant and Clendaniel had also begun discussions about the execution of their plot long before the involvement of CHS-1. As the defendant built a rapport with CHS-1, he repeatedly referenced Clendaniel in an effort to entice CHS-1 to participate in the plot. In December, the defendant told CHS-1 that, "someone else i know in maryland, not connect to nsrf or anything is gonna be doing the same things as you." Government's Trial Exhibit 118.

A month later, the defendant pitched the prospect of including CHS-1 in the plot with Clendaniel again. He stated, "I knew someone else but they've had a wrench thrown into their plans unfortunately…so we'll see if they can get back up to speed in time." Government's Trial Exhibit 119. After explaining that Clendaniel had difficulty securing a firearm, the defendant asked if CHS-1 could help. *Id*.

What followed was a coordinated plot to attack the power grid at a time when residents would need it the most, in the dead of winter. The defendant noted the following in text messages introduced at trial

> So with that in mind you;d (sic) want to do a tiny bit of tomfoolery when there is greatest strain on grid. Like when everyone is using electricity to either heat or cool their homes…i think is best to wait till when it gets colder than normal and everyone has heat cranked up.

Government's Trial Exhibit 114.

These message underscore just how dangerous the realized plot could have been. It also underscores just how detached the defendant was from empathy. To act in this manner, with such a callous disregard for the effect this would have on potentially hundreds of thousands of people is reprehensible. The Court must hold him accountable for it.

### ii. The History and Characteristics of the Defendant Warrant 20 Years in Prison.

The defendant is the founder of the "Atomwaffen Division," a neo-Nazi organization that advocated for racially and ethnically motivated violence throughout the United States. For well over a decade, whether through the Atomwaffen Division, or in connection with other loosely aligned groups, the defendant has spewed his hateful views in online forums to anyone willing to listen. Just like his call to arms, he has acted to "Make it Count."

The defendant's arrest in May 2017 demonstrates the lengths with which the defendant would go to further his cause. The defendant's first conviction arose as a result of his roommate murdering their other two roommates. The resulting investigation, which included the execution of a search warrant on the defendant's home, yielded bomb making materials. As reflected in the government's sentencing memorandum in that case,

In the garage, agents found a cooler containing a white cake-like substance that two FBI and TPD bomb technicians immediately recognized through their training and experience as the highly volatile explosive Hexamethylene Triperoxide Diamine (HMTD). Within a short distance of the HMTD were explosive precursors such as potassium chlorate, potassium nitrate, several pounds of ammonium nitrate (a blasting agent that was in a package addressed to Russell), nitro methane, hexamine, and citric acid. Also within a short distance of the HMTD were empty 5.56 caliber shell casings with fuses and electric matches, both of which could be used to detonate a destructive device.

*United States v. Russell,* S.D. Fla. 8:17-cr-00283-SCB-JSS ECF 71 at 2-3.

Investigators further located neo-Nazi paraphernalia and a framed photograph of Timothy McVeigh, the man responsible for the 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City. *Id*. at 3. The defendant further admitted to making the HMTD, but denied its true purpose. *Id*.

While in custody, the defendant did not seek to reform himself, or show any remorse. Instead, he dug deeper into his racist ideology, creating neo-Nazi art and propaganda, and cultivated relationships with other neo-Nazis to aid in the furtherance of his criminal activity.

The defendant even went so far as to include his own drawings in an edition of the compilation of writings drafted by noted neo-Nazi, James Mason entitled *Siege* upon his release.







Images extracted from Government's Trial Exhibit 23-A.



Government's Trial Exhibit 420.

Additionally, throughout the pendency of the instant case, and even after conviction, the defendant's beliefs and illegal conduct have persisted. As recently as July 1, 2025, the defendant and Clendaniel managed to speak to one another through third parties in a post-trial recorded jail call. *See* Exhibit A (July 1, 2025 Recorded Call). There, the defendant and Clendaniel discussed using a third part to set up a P.O. box to allow them to communicate, and contributing to a publication titled the "White Prison Newsletter." *See* Exhibit B (White Prison Newsletter).

For at least a decade, the defendant has espoused harmful and dangerous rhetoric. This is who he is. There appears to be no end in sight.

### iii. A Sentence of 20 Years Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment for the Offense.

The conduct, a terrorist plot to destroy the critical infrastructure of a major American city, is undoubtedly serious. Likewise, the defendant's willingness to engage in a terrorist plot *while actively under federal supervision* for engaging a terrorist plot demonstrates a clear disregard for the law and lack of rational judgment. The defendant's persistent efforts to circumvent the law, even while in custody reflect a deeper concern in addressing an appropriate sentence for the defendant: he will not stop.

Even more than punishment, a sentence of 20 years must serve to incapacitate the defendant and allow law enforcement to monitor his communications and movements for the foreseeable future. As discussed infra, the safety of the American public depends on it.

### iv. A Sentence of 20 Years Helps Promote the Goals of Special and General Deterrence.

It is aspirational to believe that the defendant will ever be deterred from this conduct. In less than a decade, the defendant has been convicted of two offenses related to the destruction of critical infrastructure. While incarcerated the first time, the defendant only deepened his resolve to organize and promote acts of mass political violence. In the countless writings and drawings created by the defendant during his time in prison, the defendant romanticized mass murderers and Nazis.

Upon release, and while under federal supervision, the defendant jumped headfirst back into the online community that referred to itself as "Terrorgram." The trial record highlighted the defendant's lively online persona, but also exposed an individual concerned about sharing personal details concerning his identity. *See* Government's Trial Exhibit 300. This furtive conduct underlies the concern that the defendant is either incapable or unwilling to change.

What also became abundantly clear at trial is that there are countless others who share in the defendant's beliefs. The Court can only hope to deter individuals who spew this filth and hide behind keyboards and phone screens from acting on their beliefs by sentencing the defendant to the maximum allowable sentence. Because, despite how abhorrent the beliefs may be, it is only the actions in support of the beliefs that warrant court intervention.

This nuance is important. Despite the protestations of the defendant at trial, he was not on trial for his beliefs. The general public can rest assured that the Court and the government will not trample on their First Amendment rights. Those individuals, however, will be held accountable if they act criminally in furtherance of them. A sentence of twenty years sends that message.

### v.   A Sentence of 20 Years is Necessary to Protect the Public.

The protection of the public is paramount in sentencing the defendant. Baltimore, a city comprised of over 60% African American residents, is home to approximately 550,000 residents. The city houses nearly a dozen hospitals, and countless law enforcement agencies, churches, food pantries, and homeless shelters. The residents of this city and the surrounding metropolitan area are heavily reliant on these organizations and community partners. The effect on those in need of care, including the elderly, children, and individuals with significant medical conditions could have been catastrophic if the plot had been realized.

The defendant's conduct extends beyond the Baltimore, though. The defense highlighted numerous times that the defendant lived in Orlando, Florida, and never traveled to Baltimore throughout the course of the conspiracy. He did not need to. His words and actions touched not only Baltimore, but the entire country. For example, the defendant advocated the destruction of the power grid of San Antonio, Texas to thwart a pride parade. *See* Government's Trial Exhibit 601. Similarly, the defendant's repeated posting of openinframap.org was specifically designed to highlight areas of critical infrastructure throughout the country for attack.

Additionally, as recently as July 3, 2025, another member of the Terrorgram Collective was arrested and charged in the Eastern District of California on charges of conspiracy, soliciting the murder of federal officials, and other offenses. *See United States v. Noah Lamb,* E.D. Cal. 2:25-cr-00152-TLN. The reach of this group is expansive. They praise those who commit acts of violence in furtherance of their cause, and refer to those individuals as "saints." *See* Government's Trial Exhibit 51 ("The Path to Sainthood"). It is paramount that the Court sentence the defendant to maximum allowable sentence, if only to prevent him from attempting to become a saint himself.

**vi.   A Sentence of 20 Years is Not Needlessly Disparate.**

The defense argues that the defendant is less culpable than his co-defendant because the defendant did not travel or intend to travel to Maryland to participate in the physical attack of the substations. *See* ECF 246 at 3. This misses the mark.

First, the defendant's status as a neo-Nazi strategist and organizer is well documented. In several of the exhibits produced at trial, the defendant was referred to as the founder and leader of the Atomwaffen Division, including one exhibit where he attempted to wish himself a birthday. *See* Government's Trial Exhibit 107 ("Brandon Russell's bday was yesterday. Founder of awd."). As discussed at length, the defendant's desire to eradicate western civilization through the destruction of the power grid went beyond fascination. It was a full-blown obsession. In the hundreds of messages attributed to the defendant at trial, his persistent message to attack, dismantle and destroy made it evident that he was the captain of the ship.

It is through his influence that the defendant attempted to groom so many people to perform attacks, and it is how he was able to introduce Clendaniel and CHS-1 to one another. The defendant pestered CHS-1 for weapons to use during the attack, coordinated calls and messages related to the planning of the attack, and provided crucial insight into the workings of electrical transformers and substations, including their vulnerabilities. Without the critical knowledge provided by the defendant and introduction of CHS-1 to Clendaniel, the plot would not have come as close to realization as it did. He cannot avoid responsibility for it now.

Second, the defendant was adjudged guilty *after* trial. This is a significant difference between the defendant and Clendaniel. Acceptance of responsibility is a crucial consideration for the Court in determining an appropriate sentence after conviction. USSG 3E1.1 acknowledges the importance of such acceptance by allowing a two-level reduction for demonstration of

14

responsibility for an offense, and the potential for an additional one-point reduction, "thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." Application Note 2 further provides, "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."

Clendaniel accepted responsibility for her conduct without the necessity for a trial. The defendant did not. At great time and expense to the Court and the government, a weeklong trial commenced where the government presented multiple witnesses who traveled from various locations throughout the country, some under disguise for fear of retribution. The circumstances under which the defendant and co-defendant were adjudged guilty are vastly different, and therefore warrant a separate consideration by the Court.

## CONCLUSION

For all of these reasons, the government respectfully asks this Court to sentence the defendant to 20 years' imprisonment, followed by lifetime supervised release with all recommended conditions sought by U.S. Probation.

Respectfully Submitted,

Kelly O. Hayes
United States Attorney

Michael F. Aubin
Joseph R. Baldwin
Assistant United States Attorney